**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 13-21230-CIV-ALTONAGA**

**ADIDAS AG**, *et al.*,

       Plaintiffs,

vs.

**ADIDASCRAZYLIGHT2.COM**, *et al*.,

       Defendants.

_____/

**ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION**
**FOR TEMPORARY RESTRAINING ORDER**

     **THIS CAUSE** came before the Court upon Plaintiffs, adidas AG ("adidas AG"), adidas International Marketing B.V. ("adidas International"), adidas America, Inc. ("adidas America") (collectively, "adidas"), Reebok International Limited ("Reebok International"), Reebok International Ltd. ("Reebok Ltd.") (collectively, "Reebok."), and Sports Licensed Division of the adidas Group, LLC's ("SLD['s]") (collectively, "Plaintiffs[']") *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction (the "Application for TRO") [ECF No. 5], filed April 14, 2013. The Application for TRO asks the Court to issue a temporary restraining order and a preliminary injunction against the partnerships and unincorporated associations that operate the websites that infringe Plaintiffs' respective trademarks and promote and sell counterfeit versions of Plaintiffs' respective goods. Among other things, Plaintiffs ask that the Court enjoin Defendants from producing or selling goods which infringe their trademarks, and that the Court seize control of the domain names of the infringing websites and redirect the web traffic searching for those domains to another site that displays a copy of the pleadings from

this case.   The Court has carefully considered the Application for TRO and pertinent portions of the record.

## I. INTRODUCTION

Plaintiffs are suing Defendants, the Partnerships and Unincorporated Associations Identified on Schedule A attached to Plaintiffs' Application for TRO[1] (*see* Appl. for TRO, Schedule A, at 21–25), and Does 1-1,000 (collectively, "Defendants") and their various unknown associates for trademark counterfeiting and infringement; false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. section 1125(a); cybersquatting under 15 U.S.C. section 1125(d); and unfair competition under Florida's common law.   (*See generally* Compl. [ECF No. 1]).   Plaintiffs' Complaint alleges Defendants are promoting, advertising, distributing, offering for sale and selling counterfeit and infringing versions of Plaintiffs' products within the Southern District of Florida through fully interactive commercial Internet websites operating under certain domain names (the "Subject Domain Names").[2]

Plaintiffs allege Defendants' unlawful activities have caused and will continue to cause irreparable injury to Plaintiffs because Defendants have (1) deprived Plaintiffs of their right to determine the manner in which Plaintiffs' trademarks are presented to the public through merchandising; (2) defrauded the public into thinking Defendants' goods are Plaintiffs' authorized goods; (3) deceived the public as to Plaintiffs' association with Defendants' goods and the websites which market and sell the goods; and (4) wrongfully traded and capitalized on

---

[1] As Plaintiffs are not requesting immediate equitable relief against all the Defendants identified in their Complaint, the Court herein refers to the Defendants identified on Schedule A attached to Plaintiffs' Application for TRO.

[2] The complete list of websites includes one hundred and fifty-three (153) domain names.  For a complete list, see Schedule A of the Complaint.

Plaintiffs' respective reputations and goodwill as well as the commercial value of Plaintiffs' trademarks.

In the Application for TRO, Plaintiffs move for the issuance of a temporary restraining order, and, upon expiration of the temporary restraining order, a preliminary injunction against Defendants, pursuant to 15 U.S.C. section 1116 and Federal Rule of Civil Procedure 65, for alleged violations of the Lanham Act.

## II.  FACTUAL BACKGROUND [3]

Plaintiff adidas AG is a joint stock company organized and existing under the laws of the Federal Republic of Germany, having its office and principal place of business at Postach 1120, D-91072 Herzogenaurach, Federal Republic of Germany.  (*See* Compl. ¶ 4).  adidas International is a corporation organized and existing under the laws of Netherlands, having its principal place of business in the Netherlands.  adidas International is wholly owned by adidas AG and its affiliates.  (*See* Compl. ¶ 5).  adidas America is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 5055 N. Greeley Avenue, Portland, Oregon, 97217.  (*See* Compl. ¶ 6).  adidas America is wholly owned by adidas AG and its affiliates, and within this country adidas America is a licensed distributor of adidas-branded merchandise, including goods bearing the distinctive adidas Mark, Trefoil Mark, and 3 Bars Logo.  (*See id.*).  adidas manufactures, promotes, distributes, and sells in interstate commerce, including within this Judicial District, high quality products under a number of adidas' trademarks.  (*See* Decl. of Jeni B. Zuercher in Support of Plaintiffs' Application for TRO ("Zuercher Decl.") ¶¶ 4, 5 [ECF No. 5-1]).

---

[3] The factual background is taken from the Complaint, the Application for TRO, and supporting Declarations submitted by Plaintiffs.

adidas is the registered owner of the following trademarks on the Principal Register of the United States Patent and Trademark Office, all of which are valid and incontestable pursuant to 15 U.S.C. section 1065  (the "adidas Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| ADIDAS | 0,891,222 | May 19, 1970 | IC25 - sportswear namely, suits, shorts, pants, tights, shirts, gloves, and the like; jerseys; socks; sport shoes namely, track and field training shoes, basketball shoes, and tennis shoes. |
|  | 0,973,161 | November 20, 1973 | IC 13 - tote bags<br><br>IC 25 - specific purpose athletic shoes; general purpose sport shoes, sports wear-namely, suits, shorts, pants, tights, shirts, jerseys, socks, and gloves. |
| adidas | 1,300,627 | October 16, 1984 | IC 025 - sportswear namely, suits, shorts, pants, tights, shirts, jerseys, socks, gloves, jackets, coats, swimwear, sweaters, caps, pullovers, warm-up suits, rain suits, ski suits, jump suits, boots, shoes, slippers. |
|  | 1,310,140 | December 18, 1984 | IC 025 - sportswear-namely, suits, shorts, pants, tights, shirts, jerseys, socks, gloves, jackets, coats, swimwear, sweaters, caps, pullovers, warm-up suits, rain suits, ski suits, jump suits, boots, shoes, slippers. |
| adidas | 2,138,288 | February 24, 1998 | IC 009 - eyeglasses and sunglasses.<br><br>IC 014 - watches and wrist watches. |

CASE NO. 13-21230-CIV-ALTONAGA

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
|  | 2,411,802 | December 12, 2000 | IC 018 - all purpose sport bags, athletic bags, traveling bags, backpacks, knapsacks, beach bags<br><br>IC 025 - sports and leisure wear, namely, shorts, pants, shirts, t-shirts, jerseys, tights, socks, gloves, jackets, swimwear, caps and hats, pullovers, sweat-shirts, sweat suits, track suits, warm-up suits, rain suits; boots, slippers, sandals, specific purpose athletic shoes and general all purpose sports shoes<br><br>IC 028 - sports balls and playground balls; guards for athletic use, namely, shin guards, knee guards and leg guards |

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| adidas (trefoil logo) | 3,104,117 | June 13, 2006 | IC 009 - optical apparatus and instruments, namely, eyeglasses and sunglasses<br><br>IC 014 - horological and chronometric instruments, namely, watches<br><br>IC 018 - leather and imitations of leather, and goods made from these materials in the nature of bags for general and sport use, namely handbags, tote bags, waist packs, overnight bags, backpacks, knapsacks and beach bags; trunks; traveling bags for general and sport use; leather and imitations of leather and goods made from these materials, namely, wallets, briefcases, and key cases<br><br>IC 025 - sports and leisure wear, namely suits, shorts, pants, sweatpants, skirts, skorts, dresses, blouses, shirts, t-shirts, sleeveless tops, polo shirts, vests, jerseys, sweaters, sweatshirts, pullovers, coats, jackets, track suits, training suits, warm-up suits, swimwear, underwear, socks, gloves, scarves, wristbands and belts; headgear, namely caps, hats, visors, headbands; athletic footwear and leisure foot wear, namely boots, sandals, specific purpose athletic shoes and general purpose sports shoes |

The adidas Marks are used in connection with the manufacture and distribution of high quality goods in at least the categories identified above.  (*See id.* ¶ 5; *see also id.* Comp. Ex. A [ECF No. 5-2]).

Reebok International is a corporation organized and existing under the laws of England, having its principal place of business at 11/12 Pall Mall, London SWI Y 5LU, England. (*See* Compl. ¶ 7). Reebok International is wholly owned by adidas AG and its affiliates. (*See id.*). Reebok Ltd. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, having its principal place of business at 1895 J.W. Foster Boulevard, Canton, Massachusetts, 02021. (*See id.* ¶ 8). Reebok Ltd. is wholly owned by adidas AG and its affiliates. (*See id.*). Reebok manufactures, promotes, distributes, and sells in interstate commerce, including within this Judicial District, high quality products under a number of Reebok's trademarks. (*See* Zuercher Decl. ¶¶ 13, 14).

Reebok is the registered owner of the following trademarks on the Principal Register of the United States Patent and Trademark Office, all of which are valid and incontestable pursuant to 15 U.S.C section 1065 (the "Reebok Marks"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| REEBOK | 1,133,704 | April 22, 1980 | IC 25 - shoes for use in athletic sports |
|  | 1,848,848 | August 9, 1994 | IC 018 - all purpose sport bags, duffel bags, tote bags, knapsacks, and shoulder bags.<br><br>IC 025 - footwear and apparel; namely, t-shirts, shirts, sweatshirts, sweaters, jackets, hats, visors, socks, sweatpants, pants, shorts, skirts, unitards, and leotards. |

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| RBK | 3,074,802 | March 28, 2006 | IC 09 - eyewear, namely, eyewear cases; eyewear cleaning cloths; sunglasses; protective helmets for hockey, and skating. <br><br> IC 025 - footwear; headwear; apparel, namely, sweatpants, sweatshirts, shirts, shorts, sweaters, socks, jackets, sweat suits, warm-up suits, shooting shirts, fleece tops, tank tops, polo shirts, pants, athletic bras, leggings, skirts, turtlenecks, vests, dresses, athletic uniforms, gloves, infant wear, running suits. <br><br> IC 028 - sports equipment, namely, basketballs, footballs, rugby balls, soccer balls, in-line skates, hockey skates; protective hockey equipment, namely shin pads, elbow pads, shoulder pads, and pants; protective in-line skating equipment, namely kneepads and elbow pads. |

The Reebok Marks are used in connection with the manufacture and distribution of high quality goods in at least the categories identified above. (*See id*. ¶ 14; *see also id*. Comp. Ex. B [ECF No. 5-3]).

SLD is a limited liability company organized and existing under the laws of the State of Delaware, having its principal place of business at 8677 Logo Athletic Ct., Indianapolis, IN 46219. (*See* Compl. ¶ 9). SLD manufactures, promotes, distributes, and sells in interstate commerce, including within this Judicial District, high quality products under a number of SLD's trademarks. (*See* Zuercher Decl. ¶¶ 23, 24).

SLD is the registered owner of the following trademarks on the Principal Register of the United States Patent and Trademark Office, which is valid and incontestable pursuant to 15 U.S.C. section 1065 (the "Mitchell & Ness Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|--------------------|------------------|---------------|
| MITCHELL & NESS | 2,860,283 | July 6, 2004 | IC 025 - sports jerseys, jackets, shirts, t-shirts, sweaters, caps, hats, head bands and wrist bands |

The Mitchell & Ness Mark is used in connection with the manufacture and distribution of high quality goods in at least the categories identified above. (*See id*. ¶ 23; *see also id*. Comp. Ex. C [ECF No. 5-4]).

Plaintiffs hired Eric Rosaler ("Rosaler") of AED Investigations, Inc. to investigate suspected sales of counterfeit versions of Plaintiffs' products by Defendants. (*See* Zuercher Decl. ¶ 32; Decl. of Eric Rosaler in Support of Plaintiffs' Application for TRO ("Rosaler Decl.") ¶ 3 [ECF No. 5-6]). In April 2013, Rosaler accessed the Internet website operating under the Subject Domain Name adidascrazylight2.com and finalized the purchase of a pair of shoes bearing at least one of the adidas Marks at issue in this action. (*See* Rosaler Decl. ¶ 4; *see also id.* Comp. Ex. A [ECF No. 5-7]). Additionally, Rosaler accessed the Internet website operating under the Subject Domain Name reebokjerseysell.com and finalized the purchase of a jersey bearing at least one of the Reebok Marks at issue in this action. (*See* Rosaler Decl. ¶ 5; *see also id*. Comp. Ex. B [ECF No. 5-8]). Rosaler also accessed the Internet website operating under the Subject Domain Name cheapbrands4u.com and finalized the purchase of a hat bearing the Mitchell & Ness Mark at issue in this action. (*See* Rosaler Decl. ¶ 6; *see also id.* Comp. Ex. C [ECF No. 5-9]). Rosaler's purchases were processed entirely online. (*See* Rosaler Decl. at ¶¶ 4–6).

Plaintiffs then asked Jeni B. Zuercher, their Senior Brand Protection Manager, who is familiar with Plaintiffs' genuine goods and trained to detect counterfeits, to review and visually inspect the web page listings, as well as detailed web page captures of the items bearing Plaintiffs' Marks purchased by Rosaler.  (*See* Zuercher Decl. ¶¶ 34, 36, 38).  Zuercher determined the items purchased by Rosaler were non-genuine, unauthorized versions of Plaintiffs' products.  (*See id.*).  Additionally, Zuecher reviewed and visually inspected the items bearing Plaintiffs' Marks offered for sale on the Internet websites operating under all of the Subject Domain Names and determined the products were non-genuine, unauthorized versions of Plaintiffs' respective products.  (*See id.* ¶¶ 39–41).

Based on the investigation, Plaintiffs allege Defendants have advertised, offered for sale, and/or sold (i) apparel, footwear, headwear and sunglasses bearing counterfeits, reproductions, and/or colorable imitations of the adidas Marks, (ii) apparel and footwear bearing counterfeits, reproductions, and/or colorable imitations of the Reebok Marks, and (iii) apparel and headwear bearing counterfeits, reproductions, and/or colorable imitations of the Mitchell & Ness Mark. (*See* Zuercher Decl. ¶¶ 32–41; Rosaler Decl. ¶¶ 4–6).  Defendants are not now, nor have they ever been authorized or licensed to use, reproduce, or make counterfeits, reproductions, and/or colorable imitations of Plaintiffs' Marks.  (*See* Zuercher Decl. ¶ 31).

### III.  LEGAL STANDARD

Plaintiffs have filed claims pursuant to 15 U.S.C. sections 1114(1)(a), 1125(a), and 1125(d), and Florida's common law.  Title 15 U.S.C. section 1116(a) provides the Court "shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c),

or (d) of section 1125 of this title." 15 U.S.C. § 1116. Injunctive relief is also available under section 1116(a) for a violation of section 1114(1)(a). *See id.* § 1116(d)(1)(A).

In order to obtain a temporary restraining order, a party must demonstrate "(1) [there is] a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non- movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (citation omitted); *see also Levi Strauss & Co. v. Sunrise Int'l. Trading Inc.*, 51 F. 3d 982, 985 (11th Cir. 1995) (applying the test to a preliminary injunction in a Lanham Act case). Additionally, a court may only issue a temporary restraining order without notice to the adverse party or its attorney if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party or can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

FED. R. CIV. P. 65(b)(1). *Ex parte* temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameida Cnty, etc.*, 415 U.S. 423, 439 (1974) (footnote call number omitted).

With respect to scope, generally, "persons who are not actual parties to the action or in privity with any of them may not be brought within the effect of a[n injunctive] decree merely by naming them in the order." Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 2956 (2d ed. 1995) (footnote call number omitted). However, "a decree of injunction not only binds the parties defendant but also those identified with them in interest, in

'privity' with them, represented by them or subject to their control." *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 180 (1973) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)); *see also* Fed. R. Civ. P. 65(d)(2). Specifically relevant to this case, 15 U.S.C. section 1114(2)(D) implicitly provides the Court with authority to request or order "[a] domain name registrar, domain name registry, or other domain name registration authority . . . [to] deposit[] with a court, in which an action has been filed regarding the disposition of the domain name, documents sufficient for the court to establish the court's control and authority regarding the disposition of the registration and use of the domain name." 15 U.S.C. § 1114(2)(D)(i).

## IV.  ANALYSIS

### A.   Probability of Success on the Merits

#### 1.   Counterfeiting and Infringement – 15 U.S.C. section 1114

Section 32 of The Lanham Act, 15 U.S.C. section 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive." To prevail on a trademark infringement claim, a plaintiff must demonstrate "(1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001) (footnote call number and citation omitted).

To evaluate likelihood of consumer confusion in a Lanham Act trademark claim, the Eleventh Circuit has developed a seven factor balancing test. *See Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989). The seven factors are: "(1) type [or strength] of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (3) similarity of

the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion." *Lipscher v. LRP Publ'ns, Inc.,* 266 F.3d 1305, 1313 (11th Cir. 2001) (citation omitted); *see also Dieter,* 880 F.2d at 326. No single factor is dispositive. *See Lipscher,* 266 F.3d at 1313.

The Court has considered these seven factors in light of the submissions provided by Plaintiffs and concludes the balance of factors indicates there is a likelihood consumers would confuse Defendants' websites and products with the Plaintiffs' genuine versions. In particular, the submissions provided by Plaintiffs support the strength of Plaintiffs' Marks, show that the goods produced and sold by Defendants are nearly identical to Plaintiffs' respective genuine products, indicate that both Plaintiffs and Defendants target the same U.S. customers on the Internet, suggest that Defendants intended to benefit from the use of Plaintiffs' brand reputation, and show that consumers viewing Defendants' counterfeit goods post-sale would actually confuse them for Plaintiffs' real products. Accordingly, Plaintiffs have shown a probability of success on the merits of their trademark counterfeiting and infringement claim under section 1114.

### 2.      False Designation of Origin – 15 U.S.C. section 1125(a)

The test for liability for false designation of origin under 15 U.S.C. section 1125(a) is the same as for a trademark counterfeiting and infringement claim — i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992). As just discussed in relation to Plaintiffs' trademark counterfeiting and infringement claims, Defendants' goods are likely to be confused by consumers for Plaintiffs' genuine products. Therefore, Plaintiffs have shown a likelihood of success on Plaintiffs' claim of false designation of origin.

### 3.      Cybersquatting Claim – 15 U.S.C. section 1125(d)

The Anticybersquatting Consumer Protection Act ("ACPA") protects the owner of a distinctive or famous trademark from another's bad faith intent to profit from the trademark owner's mark by registering or using a domain name which is identical or confusingly similar to, or dilutive of, the trademark owner's mark without regard to the goods or services of the parties. *See* 15 U.S.C. § 1125(d).  To prevail under the ACPA, a plaintiff must prove: "(1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (3) the defendant registered or used the domain name with a bad faith intent to profit."  *Bavaro Palace, S.A. v. Vacation Tours, Inc.*, 203 F. App'x 252, 256 (11th Cir. 2006) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

As to the first element, the adidas Marks and Reebok Marks are inherently distinctive because they are arbitrary as applied to the products which they identify — i.e., they "do[] not suggest or describe the goods or services offered thereunder." *Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc.*, 161 F. Supp. 2d 1339, 1349 (S.D. Fla. 2001) (citing *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335–36 (11th Cir. 1999)).  Moreover, the adidas Marks and Reebok Marks are indisputably famous because they enjoy widespread recognition by consumers.  Regarding the second element — use of confusingly similar domain names — Plaintiffs have supplied a list of domain names allegedly used by Defendants to sell counterfeit versions of Plaintiffs' products.  The confusingly similar Subject Domain Names are identified on Schedule C to Plaintiffs' Complaint.[4]  (*See* Compl. ¶ 57).  Plaintiffs have provided

---

[4] The Court may seize control of the remaining Subject Domain Names which do not themselves contain any of Plaintiffs' Marks because the websites associated with those domain names allegedly promote and offer for sale goods which infringe Plaintiffs' in violation of sections 1114 and 1125(a).  *See Chanel, Inc. v. 2012chanelbagsoutletstore.com et al*, 1:12-cv-22075-CMA (S.D. Fla. June 13, 2012) [ECF No. 6].

sufficient evidence in their submissions to support the conclusion that these domain names are confusingly similar to at least some of the adidas Marks or Reebok Marks.  With regard to the third element — whether Defendants registered the domain names with the bad faith intent to profit — the Court has considered the nine factors laid out in 15 U.S.C. section 1125(d)(1)(B)(i)(I)–(IX) and concludes the submissions provided by Plaintiffs adequately demonstrate Defendants registered the Subject Domain Names in bad faith to attract customers using the adidas Marks and/or Reebok Marks to sell them counterfeit versions of Plaintiffs' products.  Consequently, Plaintiffs have shown a likelihood of success on the merits of their section 1125(d) claim.

### 4.    Unfair Competition Under Florida's Common Law

Whether a defendant's use of a plaintiff's trademark creates a likelihood of confusion between the plaintiff's and the defendant's products is also the determining factor in the analysis of unfair competition under the common law of Florida.  *See Rolex Watch U.S.A., Inc. v. Forrester*, No. 83–8381–Civ-Paine, 1986 WL 15668, at *3 (S.D. Fla. Dec. 9, 1986) ("The appropriate test for determining whether there is a likelihood of confusion, and thus trademark infringement, false designation of origin, and unfair competition under the common law of Florida, is set forth in *John H. Harland, Inc. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir. 1983).").  As discussed in relation to Plaintiffs' trademark counterfeiting and infringement claims, Plaintiffs have established there is a likelihood of confusion regarding Defendants' use of Plaintiffs' Marks on their counterfeit and infringing products.  Accordingly, Plaintiffs have also shown a likelihood of success on the merits of their common law unfair competition claim.

**B.      Irreparable Injury**

The Eleventh Circuit has acknowledged that "once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim,"[5] there is a "presumption of irreparable harm." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) (citations omitted).  However, the strength of this presumption has been called into question by the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).  *See N. Am. Med. Corp.*, 522 F.3d at 1227-28 (discussing *eBay*).  After *eBay*, a court may grant preliminary injunctive relief "without the benefit of a presumption of irreparable injury," or may "decide that the particular circumstances of the instant case bear substantial parallels to previous cases such that a presumption of irreparable injury is an appropriate exercise of its discretion in light of the historical traditions." *Id.* at 1228.

As already discussed, based on Plaintiffs' submissions to this point, there is a substantial likelihood that consumers will incorrectly believe Defendants' websites and products are approved or sponsored by Plaintiffs.  Although the Court may be permitted to presume irreparable harm from the likely consumer confusion in this case, it is not necessary to rely on a presumption.  The operation of Defendants' websites displaying Plaintiffs' Marks and the sale of Defendants' inferior goods to consumers is likely to cause irreparable damage to Plaintiffs' respective reputations if they continue because Plaintiffs will not have the ability to control the quality of what appears to be their products in the marketplace.  This damage to Plaintiffs' respective reputations and goodwill could not be easily quantified nor could it be undone through an award of money damages.  *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008).

---

[5] As discussed in the legal standard section *supra*, injunctive relief is available on each of Plaintiffs' four claims, not only the trademark infringement claim.  *See* 15 U.S.C. § 1116(a).

**C.     The Balance of Hardships**

The Court is satisfied after reviewing Plaintiffs' submissions that the risk to the reputations and goodwill associated with Plaintiffs' Marks should Defendants' infringing activities continue outweighs any hardship to Defendants caused by enjoining those activities.  It does not appear that Defendants will suffer any legitimate hardship if a temporary restraining order is issued because they have no legal right to use Plaintiffs' Marks on their websites or to sell counterfeit versions of Plaintiffs' products.

**D.     Public Interest**

The public has an interest in not being misled as to the origin, source, or sponsorship of trademarked products.  *See Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.,* No. 96-2709-CIV-NESBITT, 1997 WL 244746 at *5 (S.D. Fla. Jan 10, 1997) ("The interests of the public in not being victimized and misled are important considerations in determining the propriety of granting injunctive relief." (citing *Scarves By Vera*, *Inc. v. Todo Imports, Ltd.,* 544 /F.2d 1167 (2d Cir. 1976))).  Here, Plaintiffs have demonstrated that Defendants' websites and products mislead consumers into believing they are approved or sponsored by Plaintiffs and make it more difficult for a consumer to be sure he or she is purchasing a Plaintiff's genuine product.

## V.  CONCLUSION

Based on Plaintiffs' Complaint, Application for TRO, and evidentiary submissions, the undersigned concludes that the four-part test for injunctive relief has been satisfied.  Moreover, because providing notice of this suit before granting injunctive relief would allow Defendants to funnel traffic to their current websites to new domains and allow Defendants to continue selling counterfeit products, a temporary restraining order should issue.  Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiffs' Application for Temporary Restraining Order **[ECF No. 5]** is **GRANTED** as follows:

1.    Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with Defendants having notice of this Order are hereby temporarily restrained:

    a.    From manufacturing, importing, advertising, promoting, offering to sell, selling, distributing, or transferring any products bearing the adidas Marks, Reebok Marks or Mitchell & Ness Mark, or any confusingly similar trademarks, other than those actually manufactured or distributed by Plaintiffs; and

    b.    From secreting, concealing, destroying, selling off, transferring, or otherwise disposing of: (i) any products, not manufactured or distributed by Plaintiffs, bearing the adidas Marks, Reebok Marks or Mitchell & Ness Mark, or any confusingly similar trademarks; or (ii) any evidence relating to the manufacture, importation, sale, offer for sale, distribution, or transfer of any products bearing the adidas Marks, Reebok Marks or Mitchell & Ness Mark, or any confusingly similar trademarks.

2.    Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with any Defendant having notice of this Order shall immediately discontinue the use of the adidas Marks, Reebok Marks or Mitchell & Ness Mark, or any confusingly similar trademarks, on or in connection with all Internet websites owned and operated, or controlled by them including the Internet websites operating under the Subject Domain Names;

3.      Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with any Defendant having notice of this Order shall immediately discontinue the use of the adidas Marks, Reebok Marks or Mitchell & Ness Mark, or any confusingly similar trademarks within domain name extensions, metatags or other markers within website source code, from use on any webpage (including as the title of any web page), any advertising links to other websites, from search engines' databases or cache memory, and any other form of use of such terms which is visible to a computer user or serves to direct computer searches to websites registered by, owned, or operated by each Defendant, including the Internet websites operating under the Subject Domain Names;

4.      Each Defendant shall not transfer ownership of the Subject Domain Names during the pendency of this Action, or until further Order of the Court;

5.      The domain name registrars for the Subject Domain Names are directed to transfer to Plaintiffs' counsel, for deposit with this Court, domain name certificates for the Subject Domain Names;

6.      Upon Plaintiffs' request, the privacy protection service for any Subject Domain Names for which the registrant uses such privacy protection service to conceal the registrant's identity and contact information is ordered to disclose to Plaintiffs the true identities and contact information of those registrants;

7.      Upon entry of this Order, Plaintiffs shall provide a copy of the Order by email to the registrar of record for each of the Subject Domain Names, so that the registrar of record of each of the Subject Domain Names may, in turn, notify each registrant of the Order and provide notice of the locking of the domain name to the registrant of record.  After

providing such notice to the registrars so the domain names may be locked, Plaintiffs shall also provide notice and a copy of this Order to the registrant of each Subject Domain Name via email to the email address provided as part of the domain registration data for each of the Subject Domain Names identified in the Application for TRO.  If an email address was not provided as part of the domain registration data for a Subject Domain Name, Plaintiffs shall provide notice and a copy of this Order to the operators of the Internet websites via an email address and/or online submission forms provided on the Internet websites operating under such Subject Domain Names.  After forty-eight (48) hours have elapsed after the emailing of this Order to the registrars of record and the registrants, Plaintiffs shall provide a copy of this Order to the registrars and the registries for the Subject Domain Names for the purposes described in Paragraph 8, *infra;*

8.      The domain name registrars for the Subject Domain Names shall immediately assist in changing the registrar of record for the Subject Domain Names, excepting any such domain names which such registrars have been notified in writing by Plaintiffs have been or will be dismissed from this action, to a holding account with a registrar of Plaintiffs' choosing (the "New Registrar").  To the extent the registrars do not assist in changing the registrars of record for the domains under their respective control within one (1) business day of receipt of this Order, the top-level domain (TLD) registries (or their administrators) for the Subject Domain Names, within five (5) business days of receipt of this Order, shall change or assist in changing, the registrars of record for the Subject Domain Names, excepting any such domain names which such registries have been notified in writing by Plaintiffs has been or will be dismissed from this action, to a holding account with the New Registrar.  As a matter of law, this Order shall no longer

CASE NO. 13-21230-CIV-ALTONAGA

apply to any Defendant or associated domain name dismissed from this action. Upon the change of the registrar of record for the Subject Domain Names, the New Registrar will maintain access to the Subject Domain Names in trust for the Court during the pendency of this action. Additionally, the New Registrar shall immediately institute a temporary 302 domain name redirection which will automatically redirect any visitor to the Subject Domain Names to the following Uniform Resource Locator ("URL") http://servingnotice.com/adiserp3/ whereon copies of the Complaint, Temporary Restraining Order, and all other documents on file in this action are displayed. Alternatively, the New Registrar may update the Domain Name System ("DNS") data it maintains for the Subject Domain Names, which link the domain names to the IP addresses where their associated websites are hosted, to NS1.MEDIATEMPLE.NET and NS2.MEDIATEMPLE.NET, which will cause the domain names to resolve to the website where copies of the Complaint, Temporary Restraining Order, and all other documents on file in this action are displayed. After the New Registrar has effected this change the Subject Domain Names shall be placed on Lock status, preventing the modification or deletion of the domains by the New Registrar or Defendants;

9.      Plaintiffs may enter the Subject Domain Names into Google's Webmaster Tools and cancel any redirection of the domains that have been entered there by Defendants which redirect traffic to the counterfeit operations to a new domain name or website;

10.    Each Defendant shall preserve copies of all computer files relating to the use of any of the Subject Domain Names and shall take all steps necessary to retrieve computer files relating to the use of the Subject Domain Names that may have been deleted before the entry of this Order;

11.     This Temporary Restraining Order shall remain in effect until the date for the hearing on the Motion for Preliminary Injunction set forth below, or until such further dates as set by the Court or stipulated to by the parties;

12.     This Temporary Restraining Order shall apply to the Subject Domain Names, associated websites, and any other domain names and websites properly brought to the Court's attention and verified by sworn affidavit that such new domain names are being used by Defendants for the purpose of counterfeiting the adidas Marks, Reebok Marks or Mitchell & Ness Mark at issue in this action and/or unfairly competing with Plaintiffs on the World Wide Web;

13.     Pursuant to 15 U.S.C. section 1116(d)(5)(D), Plaintiffs shall post a bond in the amount of Ten Thousand Dollars and Zero Cents ($10,000.00), as payment of damages to which Defendants may be entitled for a wrongful injunction or restraint. Plaintiffs shall post the bond prior to requesting the registries change to the registrar of record for the Subject Domain Names to a holding account with the New Registrar;

14.     A hearing is set before this Court in the United States Courthouse located at 400 North Miami Avenue, Miami, Florida 33128, Courtroom 12-2, on **Wednesday, April 24, 2013 at 8:20 a.m.**, or at such other time that this Court deems appropriate, at which time Defendants and/or any other affected persons may challenge the appropriateness of this Order and move to dissolve the same and at which time the Court will hear argument on Plaintiffs' requested preliminary injunction;

15.     Plaintiffs shall serve copies of the Application for TRO and this Order and all other pleadings and documents on file in this action on Defendants by email as described above and by posting copies of the Application for TRO and this Order on the website located at

CASE NO. 13-21230-CIV-ALTONAGA

http://servingnotice.com/adiserp3/ within forty-eight (48) hours of control of the Subject Domain Names being changed to the Court via the New Registrar's holding account, and such notice so given shall be deemed good and sufficient service thereof. Plaintiffs shall continue to provide notice of these proceedings and copies of the documents on file in this matter to Defendants by regularly updating the website located at http://servingnotice.com/adiserp3/ or by other means reasonably calculated to give notice which is permitted by the Court;

16.    Any response or opposition to Plaintiffs' Motion for Preliminary Injunction must be filed and served on Plaintiffs' Counsel forty eight (48) hours prior to the hearing set for April 24, 2013, and filed with the Court, along with Proof of Service. Plaintiffs shall file any Reply Memorandum on or before 6:00 p.m. on April 23, 2013. **Defendants are hereby on notice that failure to appear at the hearing may result in the imposition of a preliminary injunction against them pursuant to 15 U.S.C. section 116(d) and Federal Rule of Civil Procedure 65.**

**DONE AND ORDERED** in Chambers at Miami, Florida this 15th day of April, 2013.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

23